IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.  Criminal Action No. 3:22cr12

JAMARI D. TRICE,
        Defendant.

## **OPINION**

Jamari D. Trice moves to suppress evidence recovered from a police officer's warrantless search of Trice's car[1] and statements Trice made at the police precinct after his arrest. (ECF No. 16.) He argues that neither a protective search nor the plain view doctrine justified the officer's search, and that Trice did not knowingly, intelligently, or voluntarily waive his *Miranda* rights.

The Court finds that no exception to the warrant requirement justified the police officer's warrantless search and, as such, the search violated Trice's Fourth Amendment rights. The Court will grant Trice's motion to suppress the evidence recovered from his car. Because Trice knowingly, intelligently, and voluntarily waived his *Miranda* rights, however, the Court will deny his motion to suppress statements he made at the police precinct after his arrest. The Court further explains these holdings below.

---

[1] Trice says that the car is registered in his grandmother's name. The Court accepts this as true for the purposes of its analysis, but nonetheless refers to the vehicle as "Trice's car" throughout the Opinion.

## I. <u>FACTS</u>[2]

### *A. The Traffic Stop*

Around 10:30 p.m. on November 23, 2021, Officers Gilbert and Taylor were patrolling Highland Park. Citizens of that area had asked the police to increase patrols in response to multiple shootings and continuing drug crimes. As the officers drove down a two-way street, they saw Trice's car traveling in the other direction. The car had tinted windows and did not have a front license plate. Trice, who was driving at a normal speed, pulled off to the side of the road as the patrol car passed him. After the patrol car passed, he resumed driving at a normal speed. The officers then turned their car around, turned on the patrol lights, and pulled Trice over.

As the officers approached Trice's car, Officer Taylor said, "They're reaching, they're reaching."[3] From behind the car, Officer Gilbert turned on his flashlight and ordered Trice to roll down his window. Trice did so. Officer Gilbert ordered Trice to put his hands out of the window. Trice put his left hand out of the window. Officer Gilbert again ordered Trice to put both hands out of the window as he approached the driver's side of the car. Trice immediately did so. After Trice verbally confirmed that no one else was in the car, Officer Gilbert opened the driver's side door, ordered Trice to get out of the car, and told him to keep his hands "where he [could] see them." After Trice got out of the car, Officer Taylor placed him in handcuffs and guided him behind the car, where he remained with Officer Taylor during Officer Gilbert's search.

---

[2] The Court held an evidentiary hearing on the motion to suppress on April 25, 2022. The Court draws the facts below from the testimony and exhibits presented at the hearing.

[3] During the hearing, Officer Gilbert said that he also saw Trice shifting toward the center console. He says he could see Trice's movements despite the car windows being "completely blacked out" because of the car's patrol lights and his flashlight. (ECF No. 28, at 19:3–4.)

Trice asked what was happening, and Officer Taylor explained that they pulled him over for not having a front license plate. At the same time, Officer Gilbert entered and started searching Trice's car. He looked under the front seat; lifted the center console and searched its interior; opened the passenger side door; unzipped and searched a bag on the front passenger seat; pulled a jacket from the back seat and searched the pockets; and opened the glove box. Officer Gilbert did not see any contraband from outside the car, but his search revealed multiple sandwich baggies, lottery tickets, a sifter, a Pyrex measuring cup, and a loaded firearm.

### B. Post-Arrest Statements

After the police arrested Trice and brought him to a room at the police precinct, Officer Gilbert showed Trice the *Miranda* waiver form. Trice asked whether he had rights ("So look – so my rights is I don't got no rights right now?" (ECF No. 18-1, at 1:24–25)), and Officer Gilbert explained that he did. He then read Trice the *Miranda* waiver form and asked if Trice still wanted to talk to him. Trice responded that he "[was] just confused." (*Id.* at 3:1–2.) Officer Gilbert asked whether Trice "at least underst[oo]d [his] rights," and Trice said, "A little bit, yeah." (*Id.* at 3:9–13.)

Officer Gilbert explained the charges and then told Trice that he would remain in jail and would "get no bond for a while." (*Id.* at 4:12–13.) He said that Trice would "eat the charges," they would go to court, and then "[Trice would] probably get convicted of this with everything [they] found in the car." (*Id.* at 4:14–17.) Or, Officer Gilbert continued, Trice could "help [him]self." (*Id.* at 4:18.) After Trice again said, "[T]his is so confusing," Officer Gilbert told Trice that he did not need to talk to him. (*Id.* at 5:10–13.) Officer Gilbert then again asked, "Do you want to talk or not?" (*Id.* at 5:18–19.) Trice gave an inaudible response and signed the waiver form.

## II. DISCUSSION

### *A. Evidence from the Warrantless Car Search*

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). Importantly, the reasonable expectation of privacy underpinning the Fourth Amendment's prohibition against unreasonable searches also applies to cars. *See Preston v. United States*, 376 U.S. 364, 366–67 (1964).[4]

Here, Officer Gilbert did not have a warrant when he started searching Trice's car. The government nevertheless argues that two exceptions permitted this search. First, it says that Officer Gilbert had reasonable suspicion that Trice was armed and dangerous and, thus, could conduct a protective search. Second, it says that the evidence was in plain view and, as such, Officer Gilbert could see it without implicating the Fourth Amendment. Finally, the government argues that, even if Officer Gilbert violated Trice's Fourth Amendment rights, the Court should not apply the exclusionary rule in this case.

The Court disagrees. Because Officer Gilbert violated Trice's Fourth Amendment rights, and because the Court finds the exclusionary rule applicable here, it will suppress the evidence recovered during the search of Trice's car.

---

[4] *See also Byrd v. United States*, 138 S. Ct. 1518, 1527–28 (2018) (finding that an individual who lawfully possesses, controls, and has the right to exclude others from a car—regardless of ownership—"would have [an] expectation of privacy" under the Fourth Amendment).

*1. Protective Search*

The standards that apply when the police detain an individual differ from those that apply when the police arrest an individual. This is because, unlike an arrested individual, a detained individual "will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Michigan v. Long*, 463 U.S. 1032, 1052 (1983).[5]

"In evaluating the validity of an officer's investigative or protective conduct under *Terry,* the '[t]ouchstone of our analysis . . . is always "the reasonableness in all circumstances of the particular governmental intrusion of a citizen's personal security."'" *Long*, 463 U.S. at 1051 (alteration in original) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977)). For detained individuals, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1049 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)); *see United States v. Holmes*, 376 F.3d 270, 277 (4th Cir. 2004).

Here, the government says that Officer Gilbert reasonably believed that Trice was dangerous and could gain immediate control of a weapon because the traffic stop occurred in a high-crime

---

[5] The Supreme Court held in *Arizona v. Gant* that the police may search a vehicle incident to an arrest only if "the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." 556 U.S. 332, 351 (2009). But neither Officer Gilbert nor his partner placed Trice under arrest during Officer Gilbert's initial search, and, as such, *Gant* does not govern the Court's analysis. *See United States v. Griffin*, 589 F.3d 148, 154 n.8 (4th Cir. 2009); *see also Gant*, 556 U.S. at 352 (Scalia, J., concurring) ("It must be borne in mind that we are speaking here only of a rule automatically permitting a search when the driver or an occupant *is arrested*." (emphasis added)).

area; Trice exhibited evasive behavior by pulling over when the patrol car first passed him; he initially put only one hand out of the window despite the officer's instruction to do so with both; the car had tinted windows[6]; and he shifted toward the center console as the officers approached his car. According to the government, these five facts, taken together, created a reasonable belief that Trice was dangerous and may gain control of a weapon.

Police officers certainly face "inordinate risk" when approaching any vehicle, particularly late at night and in a high-crime area.[7] But the overall circumstances in this case do not support a dangerousness finding. Trice appeared to make no attempt to hide or flee from the police officers. He was not speeding before he first pulled over, resumed a normal speed after the patrol car passed, and then promptly pulled over after the police officers initiated the traffic stop.[8] And even though

---

[6] In general, "the presence of windows so tinted that the vehicle's interior compartment is not visible is, in itself, a circumstance that would cause an officer reasonably to believe that his safety might be in danger." *United States v. Stanfield*, 109 F.3d 976, 984 (4th Cir. 1997). This danger stems from an officer's inability to discern whether the suspect is alone or any weapons lie within arm's reach. Here, Officer Gilbert claims that the car windows were "completely blacked out" and, as such, that he could not tell whether other individuals were in the car. (ECF No. 28, at 19:3–4, 32:16–18.) He simultaneously claims, though, that from behind the car—and through the car's tinted windows—he saw Trice shift toward the center console: the lights from the patrol car and his flashlight, he says, allowed him to see Trice's movements. Because the Court finds this latter testimony credible, the Court has little reason to believe that Officer Gilbert could not otherwise see the interior of the car. The Court will thus consider in its analysis Officer Gilbert's testimony that he saw Trice shift toward the center console, but will assign little weight to the testimony that Officer Gilbert could not otherwise see through the windows into the car.

[7] *Mimms*, 434 U.S. at 110; *United States v. Mayo*, 361 F.3d 802, 805, 807 (4th Cir. 2004) (considering as a factor that the search occurred "in a high-crime area that had been targeted for special enforcement by the City of Richmond"); *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) ("The lateness of the hour is another fact that may raise the level of suspicion."). *But see Wingate v. Fulford*, 987 F.3d 299, 306 (4th Cir. 2021) ("Alone, [presence in a high-crime area] does little to suggest criminal activity."); *but see also Wardlow*, 528 U.S. at 139 (Stevens, J., concurring) ("[P]resence in a high crime neighborhood is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry.")

[8] The Court finds it difficult to accept Officer Gilbert's characterization of Trice's completely lawful actions as "evasive." (*Compare* ECF No. 28, at 23:18–21, 24:17–19, 25:6–8), *with*

Trice initially "placed [only his left] hand out of the window," (ECF No. 19, at 17), he put his right hand out of the window immediately after Officer Gilbert repeated the command, (ECF No. 16-1 (body-worn camera footage from traffic stop)).

The fact that Trice shifted toward the center console as the officers approached does not change the Court's analysis. Countless innocent explanations could justify this movement, including a driver's decision to proactively get out his vehicle registration.[9] Though Officer Gilbert testified that most people who reach toward the center console "are . . . trying to conceal narcotics or guns,"[10] he also testified that he did not know how far an individual would need to "shift" to reach into the center console.[11] In the context of Trice's otherwise polite, cooperative behavior,[12] this ambiguous movement—followed by Trice promptly rolling down and putting his hands out of the window—is not enough to support a reasonable belief that Trice was dangerous and would have had immediate access to a weapon.

In other cases, courts have found the *Long* standard satisfied where evidence connects the suspect to a weapon.[13] But no such connection exists here. Rather, "[t]here was no evidence or

---

*Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion . . . ."), *and United States v. Bumpers*, 705 F.3d 168, 175 (4th Cir. 2013) (defendant exhibited "evasive behavior" when he walked away "at a fast pace" after noticing the patrol car).

[9] (ECF No. 28,f at 27:8–10.)

[10] (*Id.* at 27:17–20.)

[11] (*Id.* at 28:14–16.)

[12] (*Id.* at 65:22–66:5.)

[13] *See, e.g.*, *Griffin*, 589 F.3d 148, 151, 153–54 (4th Cir. 2009) (informant identified the suspect as "the man with the gun"); *United States v. Lewis*, 466 F. App'x 170, 172 (4th Cir. 2012) (in addition to other facts, the defendant had a criminal history of firearms violations, matched the description of a robbery suspect, and carried tools consistent with robbery); *United States v. Hill*,

suggestion that [Trice] was armed," he "never became belligerent, never threatened, intimidated, or in any way suggested that he intended harm," he "was not overly nervous or evasive," and he immediately or almost immediately complied—without complaint—with each of the police officers' directives. *United States v. Neely*, 564 F.3d 346, 352 (4th Cir. 2009). To find that Trice's innocuous actions justify a protective search would give undue weight to the location in which the police encountered him.[14] The Court finds that Officer Gilbert did not have a reasonable belief to justify a protective search.

### 2. Plain View

The government also argues that Officer Gilbert properly searched Trice's car because "suspected narcotics were in plain view." (ECF No. 19, at 2.) But, fatal to this argument, Officer Gilbert "did not notice the[ listed] items *until he entered the car*." (*Id.* at 19 (emphasis added).)

"If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California*, 496 U.S. 128, 133 (1990). But, importantly, "the officer's presence at the vantage point from which he discovers the evidence in plain view *must not amount to an unjustifiable intrusion* into an area with respect to which defendant's expectations of privacy are protected by the [F]ourth [A]mendment." *United States v.*

---

252 F. App'x 532, 535 (4th Cir. 2007) (police officers reasonably believed that the defendant had taken a gun from a house, and also saw a gun in the defendant's back seat as they approached his car); *United States v. Bourque*, 157 F. App'x 646, 649 (4th Cir. 2005) (defendant matched description of armed robbery suspect).

[14] To give special weight to a person's presence in a high-crime area "would deem residents of [Highland Park]—or any other high-crime area—less worthy of Fourth Amendment protection by making them more susceptible to search and seizure by virtue of where they live." *United States v. Curry*, 965 F.3d 313, 331 (4th Cir. 2020), *as amended* (July 15, 2020), *as amended* (July 16, 2020). "Such an approach 'risk[s] treating members of our communities as second-class citizens . . . .'" *Id.* (quoting *Utah v. Strieff*, 579 U.S. 232, 252 (Sotomayor, J., dissenting)) (alteration in original).

*Bradshaw*, 490 F.2d 1097, 1100 (4th Cir. 1974) (emphasis added). In other words, "the officer must not have entered defendant's zone of privacy, or, if he has, such entry must have been justified by 'a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused.'" *Id.*

Here, Officer Gilbert "breached the driver side door of the vehicle before actually observing [the] contraband."[15] (ECF No. 27, at 5.) The government offers no justification—and the Court has likewise identified none—for this initial intrusion into Trice's zone of privacy. The government instead argues that the evidence "*would have been* observable with [Officer Gilbert's] flashlight from outside the vehicle." (*Id.* at 3 (emphasis added).) But this is not the test.

Accepting the government's *post hoc* rationalization would render meaningless the Fourth Amendment's protections against unreasonable searches. It would allow officers to enter a protected space, conduct a search, and *then* speculate whether they "could have seen" the evidence they unlawfully uncovered from a lawful vantage point. The Court declines to expand the bounds of the plain view doctrine—which already allows a police officer to view the inside of an individual's car from the outside[16]—here. Because Officer Gilbert began conducting his search before

---

[15] *See United States v. Jones*, 565 U.S. 400, 410 (2012) (explaining that "an officer's momentary reaching into the interior of a vehicle . . . constitute[s] a search").

[16] Under the doctrine, a police officer may "peer" into a vehicle "from any number of angles" without instituting a search within the meaning of the Fourth Amendment. *Texas v. Brown*, 460 U.S. 730, 740 (1983). And

> whenever, during a lawful traffic stop, officers are required to approach a vehicle with windows so heavily tinted that they are unable to view the interior of the stopped vehicle, they may, when it appears in their experienced judgment prudent to do so, open at least one of the vehicle's doors and, without crossing the plane of the vehicle, visually inspect its interior in order to ascertain whether the driver is armed, whether he has access to weapons, or whether there are other occupants of the vehicle who might pose a danger to the officers.

he saw any contraband, and because no other exception justified his initial intrusion, Officer Gilbert's warrantless search violated Trice's Fourth Amendment rights.[17]

### 3. *Suppression as a Remedy*

The government argues that suppression is not an appropriate remedy here because it would serve no purpose other than to "stifle an officer's ability to ensure his safety during a traffic stop." (ECF No. 19, at 22.) The Court disagrees.

Because of the "significant costs of" the exclusionary rule, the Supreme Court has "deem[ed] it 'applicable only . . . where its deterrence benefits outweigh its substantial social costs.'" *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). For the rule to apply,

> police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Herring v. United States*, 555 U.S. 135, 145 (2009).

Here, the circumstances leading to the unlawful search of Trice's car are likely to recur. *See United States v. Edwards*, 666 F.3d 877, 886 (4th Cir. 2011). Applying the exclusionary rule in this case will serve two important deterrent purposes: it will prevent other officers from relying on the plain view doctrine as *post hoc* justification for an unlawful intrusion into an individual's protected space; and it will further address the systemic negligence that may result when a police

---

*Stanfield*, 109 F.3d at 981. Existing law thus protects a police officer's safety by allowing the officer to view the inside of a suspect's car from the outside and, if the officer cannot do so because of the car's tinted windows, to open the door and conduct a visual search from outside the car.

[17] Because the plain view doctrine did not justify Officer Gilbert's warrantless entry into the car, the Court need not address the government's subsequent argument that seeing the items in plain view gave Officer Gilbert probable cause to search the rest of the car.

officer encounters an individual in a high-crime area.[18] With these objectives in mind, the Court will suppress the evidence recovered from Officer Gilbert's warrantless search of Trice's car.

### B. Post-Arrest Statements

Trice argues that he did not knowingly, intelligently, or voluntarily waive his *Miranda* rights. The Court disagrees, and will deny his motion to suppress his post-arrest statements.

#### 1. *Knowing and Intelligent*

For a waiver to be knowing and intelligent, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). And a defendant's "below average I.Q. does not make him per se incapable of intelligently waiving his rights."[19] *United States v. Robinson*, 404 F.3d 850, 861 (4th Cir. 2005). Rather, the Court must "review[] the totality of the circumstances" to determine whether a defendant "understood he had the right to remain silent and that anything he said could be used as evidence against him." *United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002); *see also Robinson*, 404 F.3d at 861 (where a defendant has a low intellectual capacity, "the knowingness of the waiver often turns on whether the defendant expressed an inability to understand the rights as they were recited").

Here, Trice repeatedly stated his confusion as Officer Gilbert advised him of his rights at the precinct. (*See, e.g.*, ECF No. 18-1.) He says that Officer Gilbert's fast pace, combined with Trice's "intellectual limitations," "further diminished his understanding." (ECF No. 16, at 7.) Having reviewed the record, however, the Court finds that Trice knowingly and intelligently

---

[18] *Cf. United States v. Black*, 707 F.3d 531, 542 (4th Cir. 2013).

[19] (*See* ECF No. 16, at 6–7; *see also* ECF No. 28, at 87:14–20, 89:23–90:1, 92:2–9, 93:15–24.)

11

waived his rights despite his intellectual limitations and the fact that Officer Gilbert, indeed, talks fast.[20]

In Trice's prior experiences with the criminal justice system, he received *Miranda* warnings on several occasions and invoked his right to remain silent at least once.[21]  (ECF No. 19-4.)  In this particular instance, Officer Gilbert recited part of Trice's *Miranda* rights in the car,[22] and then read him the entire waiver form at the precinct.  Then, before Trice signed the waiver form and made the statements he now seeks to suppress, Officer Gilbert gave Trice the opportunity to review the rights himself.  Both in the car and at the precinct, Trice indicated at least once that he understood his rights.  Considering Trice's experience receiving *Miranda* rights, Officer Gilbert's efforts to explain Trice's rights, and Trice's responses in this case, the Court finds that Trice had "full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  *Colorado*, 479 U.S. at 573.  Based on the totality of the circumstances, the Court finds that Trice knowingly and intelligently waived his *Miranda* rights.

### 2. *Voluntariness*

Trice also argues that Officer Gilbert used "unduly coercive" techniques to extract his statements. (ECF No. 16, at 9–10.)   He points out that he is intellectually disabled, receives Social Security Disability Benefits, and had failing grades in school.  "It was only after [Trice] was

---

[20] (*See, e.g.*, ECF No. 28, at 4:7–10, 5:6–8.)

[21] *See, e.g.*, *Robinson*, 404 F.3d at 861 (the defendant's "below average I.Q. does not make him per se incapable of intelligently waiving his rights").

[22] "We have never insisted that *Miranda* warnings be given in the exact form described in that decision." *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989).

told that if he did not talk to the Officer he would sit in jail, eat the charges, and be convicted that he decided to sign the waiver." (*Id.* at 9.)

In evaluating the voluntariness of a defendant's confession, the Court "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). In doing so, the Court "consider[s] 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *Id.* (quoting *Haynes v. Washington*, 373 U.S. 503, 513 (1963)). "[A] deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary." *Cristobal*, 293 F.3d at 141.

The facts here do not show that "law enforcement . . . attempted to 'wring[] a confession [or *Miranda* waiver] out of an accused against his will.'" *Id.* (alterations in original) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206–07 (1960)). Rather, Officer Gilbert provided Trice many opportunities to assert his rights and to ask questions before Trice signed the waiver. He read Trice his rights multiple times; explained that, even if Trice waived his rights, he could invoke them at any time; asked Trice how he could help clarify his rights and, after doing so, explained the charges against him; asked Trice if he wanted to talk to him; and reiterated that Trice could "just tell [him that he does not] want to answer a question." (ECF No. 18-1, at 5:7–9.) Officer Gilbert did state that Trice would "probably get convicted," and contrasted that with a statement that Trice "ha[d] an ability to try to help [him]self" instead. (*Id.* at 4:15–18.) This, combined with Trice's intellectual disability, might show a modicum of coercion. But it is not enough for the Court to find that Trice's "will was overborne." *Dickerson*, 530 U.S. at 434. Because Trice

13

knowingly, intelligently, and voluntarily waived his *Miranda* rights, the Court will deny his motion to suppress his post-arrest statements.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Trice's motion to suppress evidence recovered during Officer Gilbert's warrantless search of Trice's car on November 23, 2021, and will deny his motion to suppress statements he made at the police precinct after his arrest. (ECF No. 16.)

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 29 June 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge